3679.  WALLACE v. METROPOLITAN LIFE INSURANCE
COMPANY.

1. A custom on the part of a life-insurance company, under which its policy-
holders are allowed thirty days after the maturity of the premiums
within which to pay them, does not require the company to accept a
premium after the expiration of such period.
2. Where, under the terms of a policy of life insurance, premiums are
made payable at the home office of the insurance company, it may,
upon notice to a policy-holder, discontinue a custom of sending an
agent to the place of business of the insured to collect the premiums.
3. The facts of this case are held insufficient to have authorized a find-
ing that the forfeiture of the plaintiff's policy on account of non-pay-
ment of premium was waived by the insurer.

DECIDED FEBRUARY 12, 1912.

Action for damages; from city court of Atlanta—Judge Reid.
May 5, 1911.

*John A. Boykin, Dorsey & Shelton,* for plaintiff.

*Smith, Hammond & Smith, A. W. Smith Jr.,* for defendants.

POTTLE, J.  Wallace brought suit against the Metropolitan Life
Insurance Company to recover the sum of $167.82, which the
plaintiff had paid to the company in premiums on a certain life-
insurance policy, and which he alleged he was entitled to recover on
account of the wrongful and illegal cancellation of his policy by
the defendant company.  At the conclusion of the evidence the trial
judge directed a verdict in favor of the defendant, and this is the
error assigned.

1, 2.  The policy of insurance was issued on March 31, 1904, and
provided for the payment of annual premiums of $40 on March 31
of each year, beginning with the date of the issuance of the pol-
icy.  One of the conditions of the policy was that "premiums are
payable at the home office in the city of New York, but at the pleas-
ure of the company suitable persons may be authorized to receive
such payments at other places, but only on the production of the
company's receipts, signed by the secretary and countersigned by
the persons receiving the payments."  Some time after the issuance
of the policy, the plaintiff was allowed to change the manner of
payment of his premiums to quarterly instalments of $10.64 each.
It appears from the evidence that up to the fall of 1907 the plain-
tiff was an employee of the defendant company at its branch office
in Atlanta, and that he paid his premiums at the office where he

was employed. In the fall of 1907 he left the service of the company, and from that time until March, 1908, he paid two quarterly premiums to a collector of the company, who called at the plaintiff's office in the Candler building for this purpose. It was a custom of the company in Atlanta to send out agents to collect the premiums due from its policy-holders, and these agents would call either at the residence or the business office of the policy-holder, as the latter might prefer. It was also a custom of the company to allow a period of thirty days after the premium became due under the terms of the policy, within which the premium might be paid. A quarterly premium was due by the plaintiff on March 31, 1908, and under this custom could have been paid at any time up to and including April 30, 1908. This premium was not paid within the grace period, but on May 1, 1908, the plaintiff wrote a letter to the president of the company, addressed to its home office in New York, enclosing a draft for the quarterly premium and also the amount of a premium due by his wife, and asking that the same be accepted. In this letter the plaintiff stated that on April 30 a young lady stenographer at the office of the company in Atlanta called him up on the telephone and notified him that his premium was due. In this letter also the plaintiff complains at great length of the conduct of certain officers of the company in Atlanta, and of his discharge from the service of the company in 1907, and that the company's collector failed to call upon him to collect the quarterly premium which he enclosed in the letter. On May 14, 1908, one of the vice-presidents of the company in New York wrote to the company's superintendent in Atlanta, enclosing the plaintiff's draft, and suggesting to the superintendent that there was no reason why a representative of the company might not call at the plaintiff's office to collect his premiums. The superintendent was advised by the vice-president, "You can do as you please about making any arrangement such as he desires." The letter further stated: "We are willing to accept the premiums, notwithstanding the grace period has expired under both policies, and although Wallace tells us in his letter that his wife is an uninsurable risk; but if you decide that it will not be convenient to have calls made at his office for collection of these premiums at the time he elects, he should be plainly told that this is the last time we will accept premiums not tendered within the grace period." The last paragraph of this

letter was as follows: "We omitted to tell you that Wallace deducted from his remittance ten cents to cover the cost of draft and four cents to cover postage. He, of course, had no right to do this, but we would rather allow it to him than to have a squabble, if you decide that it is best for the company to accept the premiums and reinstate the business." On May 19, Wright, the superintendent, wrote to the plaintiff that if he would come to the office, he would assist him in straightening out "these matters which have been referred to me." On May 26, no reply to the last letter having been received from the plaintiff, the superintendent again wrote that unless plaintiff would come to the office within the next day or two, the papers would be returned to the New York office and he could settle with the officials there. On June 1 the plaintiff wrote to the superintendent, stating that he could be found at his office in the afternoon between certain hours, and that if the superintendent would call on the plaintiff at his office, the plaintiff would take the matter up with him. On June 9, 1908, the plaintiff's draft was returned to him by the New York office. On the lapsed-policy register for the week commencing June 14, 1908, a notation was made that the plaintiff's policy had been canceled.

Upon these facts the plaintiff insists that the judge erred in directing a verdict in favor of the defendant. In our opinion, the trial judge was clearly right in his construction of the evidence. The plaintiff relied upon a course of dealing varying the express terms of his contract, and also upon a waiver by the defendant company of the forfeiture of his policy after it had taken place on account of the non-payment of his premium. In the first place, there was no course of dealing shown under which policy-holders had been permitted to pay their premiums after the expiration of thirty days of grace allowed. It does appear that there was a custom of the company allowing this thirty-days grace, and also that the company sent out agents for the purpose of collecting the premiums, but there is no suggestion in the evidence that the company had any custom, or that it had, by any previous course of dealing, led the plaintiff to believe that he could pay his premium after the expiration of the thirty-days period. But even if such a custom existed, the company had a right to discontinue it upon notice to a policy-holder who had theretofore been receiving the benefit of such a custom. It distinctly appears from the letter of

the plaintiff to the president of the company that on April 30, the last day upon which the premium could have been paid, one of the employees of the defendant company called the plaintiff up over the telephone and reminded him that his premium was due. The plaintiff testified that he had talked with the stenographer at the Atlanta office, but could not remember whether it was in April or when, but the fair inference, from all of his testimony, is that his conversation with the stenographer is the one referred to in his letter. This conversation with an employee of the company over the telephone was sufficient to have put the plaintiff on notice that his premium receipt was at the office of the company, ready to be delivered to him upon payment of his premium, and was in effect notice to the plaintiff that the company expected him to call at the office and pay his premium. We think that there is nothing in the evidence which would have authorized the jury to find that there was a custom or course of dealing on the part of the defendant company which authorized the plaintiff to withhold his premium beyond the thirty-days period which had theretofore been allowed to him purely as a matter of grace.

3. Nor was there anything in the evidence which would have authorized the jury to find that the company had waived the forfeiture which took place at midnight on April 30 by reason of the plaintiff's failure to pay his premium before that time. It is earnestly insisted by counsel for the plaintiff in error that the letter of the vice-president to the superintendent at the Atlanta office had this effect, but we do not think this is a fair construction of that letter. The substance of the letter was that while the writer representing the company was perfectly willing to accept the premium and reinstate the plaintiff's policy, yet, at the same time, this was a matter under the direct jurisdiction of the Atlanta office, and it was left to the local superintendent to decide whether it was for the best interests of the company to accept the premium and reinstate the policy. It is true that the letters from the superintendent to the plaintiff indicate that in all probability, if the plaintiff had called at the office of the company in Atlanta, as he was invited to do, the superintendent would have adjusted the matter satisfactorily to the plaintiff. But in none of these letters was there any agreement to do this, and, besides, it appears that the plaintiff did not accept the invitation and call at the office to arrange the

matter as he was requested to do. Some stress is laid by counsel upon the fact that the company failed to note any cancellation of the policy on its register until the week beginning June 15, 1908, and counsel argue from this that the forfeiture of the plaintiff's policy was in abeyance until that time. But we can not agree to this proposition. The forfeiture took place, under the terms of the policy, as modified by the custom about which plaintiff testified, at midnight on April 30, 1908. In order to reinstate the policy, some affirmative act upon the part of the officials of the company, amounting to a waiver of the forfeiture, was necessary. Mere omission to record it upon the lapsed register until June 15, or after, could not in any way affect this question.

Retention by the company of the plaintiff's draft, under the circumstances, would not amount to a waiver. A draft is not payment until it is paid. The company did not collect the draft, and ultimately returned it to the plaintiff, who accepted it. In addition to this, the evidence shows that all during the time the company held this draft its officials were making an effort to arrange matters to the satisfaction of the plaintiff. The failure to have his policy reinstated was not due to any lack of diligence or fair dealing on the part of the officials of the defendant company, but was directly due to the plaintiff's own conduct in failing to respond to a very reasonable request on the part of the company's officials, that he meet them at their office for the purpose of discussing the matter. There was no error in directing a verdict in favor of the defendant.                                    *Judgment affirmed.*

RUSSELL, J., dissenting. I do not think the evidence with reference to the waiver or non-waiver of the forfeiture on the part of the insurance company is so clear as to have demanded the verdict directed by the court. It is perfectly plain to my mind that the insurer had the right to insist upon the forfeiture at midnight of April 30, but it requires an absolutely plain case to authorize the court to do more than to define to a jury the meaning of the word "waiver." The proof of waiver is derived from evidence of intention, as developed by the acts and declarations of the parties concerned, and is a question of fact to be determined by a jury. In my opinion the evidence would have authorized a jury to reach a different conclusion, upon the issue as to whether there was a waiver of the forfeiture, from that implied by the direction of the verdict.

Especially is this true when it is the duty of the courts to be "prompt to seize hold of any circumstance that indicates an election to waive a forfeiture, or an agreement to do so." Insurance Company v. Eggleston, 96 U. S. 577 (24 L. ed. 841) ; Knickerbocker Insurance Co. v. Norton, 96 U. S. 234 (24 L. ed. 689).